# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 03-CV-5164 (JFB) (AKT)

———————————

JOHN INTERMOR,

Plaintiff,

VERSUS

INCORPORATED VILLAGE OF MALVERNE, AND
THE BOARD OF TRUSTEES OF THE INCORPORATED VILLAGE
OF MALVERNE,

Defendants.

———————————

Memorandum and Order
August 8, 2007

———————————

JOSEPH F. BIANCO, District Judge:

John Intermor ("Intermor") brought this action against the Incorporated Village of Malverne (the "Village") and the Board of Trustees of the Village of Malverne (the "Board"),[1] asserting claims under 42 U.S.C. § 1983 for violations of his rights under the United States Constitution. Specifically, plaintiff alleged that the Village and the Board violated (1) his substantive and procedural due process rights by terminating plaintiff's position as a police officer for the Village without providing a fair hearing prior to his termination; (2) his right against self-incrimination by forcing plaintiff to offer self-incriminating testimony at two "quasi-criminal" disciplinary hearings;[2] and (3) his right to equal protection by imposing more severe disciplinary measures on him than on other, similarly situated police officers on the basis of malice or malicious intent.

Defendant has moved for summary judgment as against all of plaintiff's claims. For the reasons that follow, the Court grants defendant's motion in its entirety.

———————————

[1] In plaintiff's opposition to the motion for summary judgment, plaintiff consented to the dismissal of all claims against the Board. (*See* Pl.'s Opp. at 10.) Accordingly, the claims against the Board are dismissed.

[2] As noted *infra*, plaintiff has withdrawn his self-incrimination claim.

## I. BACKGROUND

### A. The Facts

The following facts are undisputed unless otherwise indicated.

### 1. The Shoplifting Incident

Plaintiff was employed by the Village as a police officer from June 1989 until March 2000. (Dft.'s 56.1 ¶ 1.)[3] On July 17, 1999, plaintiff stole merchandise consisting of five electrical dimmer switches ("the Merchandise") from a Home Depot store located in Elmont, New York. (*Id.* ¶¶ 2-3.) At the time, plaintiff was off-duty and was not wearing his police uniform. (Pl.'s 56.1 ¶ 152.) A videotape captured plaintiff stealing the Merchandise. (*Id.* ¶ 4.) In order to steal the Merchandise, plaintiff removed a Shop-Vac from its box, concealed the Merchandise inside the Shop-Vac box, and taped the box closed with the Merchandise inside. (*Id.* ¶ 5.) Plaintiff then went to the register and paid for certain items. (*Id.*) He then left the register and went to get the Shop-Vac, which contained the Merchandise, and paid for the Shop-Vac. (*Id.*) Plaintiff then left the Home Depot store without paying for the Merchandise. (*Id.*) In the parking lot, plaintiff was confronted by Home Depot security personnel ("Security"). (*Id.* ¶ 6.) Security confirmed that the Merchandise was inside the Shop-Vac, and plaintiff admitted to Security that he had stolen the merchandise. (*Id.* ¶¶ 7-8.)

### 2. The Investigation

Home Depot contacted the Nassau County Police Department (the "NCPD") and requested that plaintiff be prosecuted pursuant to Home Depot's policy. (*Id.* ¶¶ 9-10.) Two Nassau County police officers arrived at the scene. (*Id.* ¶ 11.) Despite plaintiff's admission of the crime, the police officers did not charge plaintiff with a crime at that time. (*Id.* ¶ 12.) The Nassau County Internal Affairs Unit conducted an investigation into the actions of the Nassau County Police Officers who failed to charge plaintiff with a crime. (*Id.* ¶ 13.) A grand jury was convened with respect to the actions of the police officers at the Home Depot store. (*Id.* ¶ 14.) Plaintiff testified before that grand jury. (*Id.* ¶ 15.)

The Nassau County Police Department subsequently charged plaintiff with petit larceny in connection with his admitted theft of the Merchandise. (*Id.* ¶ 16.) Also as a result of plaintiff's theft of the Merchandise, plaintiff signed an agreement that his "privilege, permission and authority to enter and/or remain upon this or any other Home Depot premise has been revoked and that if [he does] enter any of the above mentioned, [he] will be committing *trespass*, a violation of *the New York State Penal Law Section 140.5*." (*Id.* ¶ 18 (emphasis in original).)

### 3. Disciplinary Charges

Subsequently, on August 12, 1999, the Village brought the following disciplinary charges against plaintiff:

---

[3] Where only one party's 56.1 Statement is cited, the other party does not dispute the facts alleged.

(a) Engaging in criminal conduct, to wit: Arrest for shoplifting – July 17, 1999 at Home Depot, Elmont, NY; and

(b) Conduct unbecoming a police officer:

(i) Violating the oath of office, to wit: failing to obey the laws of the State of New York;

(ii) Violating the public trust to uphold law;

(iii) Failure to report an incident in the proper manner; and

(iv) Causing harm to the reputation, honesty and integrity of the Police Department charged with upholding the law.

(*Id.* ¶ 19.)

### 4. The Waiver Agreement

The Village's charging document also indicated that a hearing regarding the disciplinary charges would be held on August 24, 1999. (*See* Dft.'s Ex. J.) However, in conjunction with plaintiff's request for an adjournment of that hearing, plaintiff signed an agreement (the "Waiver Agreement" or the "Agreement") pursuant to which plaintiff waived:

[A]ny constitutional or other defenses to the Village's hearing or finally determining such charges, including but not limited to claims of denial of procedural or substantive due process based upon knowledge of the Village's Board of Trustees regarding the circumstances or merits of such charges arising from their discussions of this Agreement and the factual circumstances which it addresses with the Chief or the Village's attorneys. [Plaintiff] also waives any claims of violation of his rights under the Village Law or Section 75 based on those same facts.

(*Id.* ¶ 26.)   The Waiver Agreement also contained the following general release clause:

[Plaintiff] freely relinquishes, releases, and waives all possible claims and causes of action against the Village, its successors, assigns, agents, employees, Board of Trustees, and attorneys in their official and individual capacities alleging that his suspension without pay was improper or that his due process rights were violated in any manner in connection with the facts and circumstances of the August 12, 1999 Charges and his indefinite suspension without pay.

(*Id.* ¶ 27.)   Finally, the Waiver Agreement contained a clause stating that plaintiff was satisfactorily represented by his union and counsel, and was not forced or coerced to sign the Agreement, to wit:

[Plaintiff] represents and certifies by execution of this Agreement that he has had a full and fair opportunity to consult with his chosen attorney and union representative before signing the Agreement, and that he has read it carefully and fully understands its contents.   He also represents and certifies that the signing of this Agreement is voluntary and has not

3

been forced or coerced in any way, and that he is aware that it sets forth the entire agreement between the parties and that it has final and binding effect on him.   He also represents and certifies that neither the Village nor any of its agents, representatives or attorneys made any representations concerning the terms and conditions of this Agreement other than those specifically contained herein. [Plaintiff] further declares that he has been satisfactorily represented by his union and his attorney.

(Dft.'s Ex. K.)

### 5. The Guilty Plea

On September 29, 1999, the Nassau County District Attorney's Office moved to reduce the charges against plaintiff.   (*Id*. ¶ 48.)   The charges were reduced from petit larceny, in violation of New York Penal Law § 155.25, to disorderly conduct, in violation of New York Penal Law § 240.20(7).   (*Id*. ¶ 49.) On September 29, 1999, plaintiff appeared before the Honorable Margaret C. Reilly, in the New York Supreme Court, Nassau County, and pled guilty to disorderly conduct, in violation of § 240.20 of the Penal Law of the State of New York ("the Allocution"). (*Id*. ¶¶ 50-51.)

Plaintiff was offered the plea bargain to disorderly conduct in return for his truthful Grand Jury testimony against the police officers who had initially released him.   (*Id*. ¶ 52.)   During the Allocution, which took place in open court, plaintiff admitted to "acting in a disorderly manner."   (Dft.'s 56.1 ¶¶ 53, 56; Defs.' Ex. U.)   As part of the Allocution, plaintiff was required to attend a "stop-lift," or shoplifting prevention course.   (*Id*. ¶ 54.) According to plaintiff's deposition testimony,

there was "an amazing amount of press" in court at the time of the Allocution.   (*Id*. ¶ 57.)

The Mayor of the Village, Anthony J. Panzarella ("Mayor Panzarella"), who was also a member of the Board, instructed the other members of the Board not to read any articles about the matter.   (*Id*. ¶ 60.)   During the first hearing regarding the Village's disciplinary charges against plaintiff, plaintiff's counsel acknowledged that he was satisfied that nobody on the Board had seen the records from plaintiff's criminal case until the date of the hearing.   (*Id*. ¶ 61.)   An August 19, 1999  press release issued by the Village regarding this matter stated:

> The Mayor and Board of Trustees view the charges against Police Officer Intermor as extremely serious. We are looking into the facts and are taking appropriate steps to handle this matter.   The Village will follow all required procedures and will issue a final statement only after there has been a full and fair hearing of all facts.

(*Id*. ¶ 62.)   The only public comment by Mayor Panzarella regarding this matter appeared in an October 7, 1999 article of the *Malvern Times* entitled *Malverne Officer Cops Plea, Intermor Disciplined for Shoplifting*:

> "Now that it has been adjudicated in the court of law, the Village Board will hold an administrative hearing. . . . We will have to consider the facts presented to us and make a determination what kind of action, if any, to be taken against Intermor. We can, but we do not have to take into account the criminal proceeding."

4

(*Id.* ¶ 63.)  The article did not state that Mayor Panzarella had access to plaintiff's criminal court file.  (*Id.* ¶ 64.)

### 6. The First Hearing

On January 24, 2000, the Village held a disciplinary hearing (the "First Hearing") presided over by the Board.  (*Id.* ¶ 28.)  Plaintiff's attorney asked the members of the Board, which included Mayor Panzarella, to recuse themselves, and that request was denied.  (Pl.'s 56.1 Counter-Stmt. ¶ 174.)  Plaintiff's criminal case had already been resolved by the time of the First Hearing.  (*Id.* ¶ 31.)  Plaintiff testified at the First Hearing and was also permitted to  present evidence.  (*Id.* ¶¶ 31-32.)  While testifying, plaintiff admitted taking the Merchandise from Home Depot.  (*Id.* 33.)  After the First Hearing, the Board issued a written decision on March 2, 2000, finding plaintiff guilty of the following charges:

(a) Engaging in criminal conduct, to wit: Arrest for shoplifting – July 17, 1999 at Home Depot, Elmont, NY; and

(b) Conduct unbecoming a police officer:

(i) Violating the oath of office, to wit: failing to obey the laws of the State of New York;

(ii) Violating the public trust; and

(iii) Causing harm to the reputation, honesty and integrity of the Police Department charged with upholding the law.

(*Id.*  ¶¶ 34-35.)  In the Board's written

decision, it found insufficient evidence to support the sub-charge of failure to report an incident in the proper manner and dismissed that charge.  (*Id.* ¶ 36.)  As a penalty for the offenses of which the Board found plaintiff guilty, his employment was terminated effective March 3, 2000.  (*Id.* ¶ 37; Pl.'s 56.1 ¶ 176.)

### 7. The Article 78 Proceeding

Thereafter, on May 26, 2000, plaintiff commenced a special proceeding in the Supreme Court of the State of New York, Nassau County, pursuant to New York Civil Practice Law and Rules, Article 78 ("Article 78").  Following litigation of plaintiff's Article 78 petition, the court held that plaintiff was entitled to a *de novo* hearing pursuant to the Rules and Regulations Governing Disciplinary Procedure for the Police Department of the Village ("Rule and Regulations").  (*Id.* ¶ 38.)  The decision granting plaintiff a *de novo* hearing was based strictly on procedural grounds and not on the merits of plaintiff's claim that he was entitled to reinstatement. (*Id.* ¶¶ 39-40.)  Specifically, the court found that plaintiff had made a timely request for a rehearing of the charges against him and, thus, pursuant to the Rules and Regulations, he was entitled to a second disciplinary hearing.  (*See* Dft.'s Ex. Q.)  However, the court declined to grant plaintiff's request for a judgment annulling, modifying, and/or amending the Incorporated Village of Malverne's decision to terminate plaintiff's employment.  The Board appealed the decision to the Appellate Division, Second Department.  (Pl.'s 56.1 ¶ 183.)  By Order dated August 6, 2001, the Appellate Division affirmed the Supreme Court's order directing the Board to conduct a re-hearing. (*Id.* ¶ 184.)

### 8. The Second Hearing

On May 8, 2002, a *de novo* disciplinary hearing was held (the "Second Hearing"). (Defs.' 56.1 ¶ 42.) Plaintiff testified at the Second Hearing and was given the opportunity to present evidence in his defense. (*Id*. ¶¶ 43, 45.) As with the First Hearing, at the time of the Second Hearing, there were no criminal charges pending against plaintiff because the criminal case had been completed. (*Id*. ¶ 44.) By decision dated December 4, 2002, the Board again found plaintiff guilty on the same charges as it had previously found him guilty and terminated plaintiff's employment. (*Id*. ¶ 46.) Plaintiff did not file an Article 78 Petition after the Second Hearing. (*Id*. ¶ 47.)

### 9. Other Instances of Discipline Against Village Police Officers

Plaintiff alleges that there were at least three instances where supervisors in the Village police department were aware that officers other than plaintiff had engaged in criminal activity, and the resulting disciplinary action was less severe than in plaintiff's case. (*Id*. ¶ 67.) Two of these incidents involved Officer John Brasca ("Officer Brasca"), and the other involved Sergeant, Randy Damico ("Sgt. Damico"). (*Id*. ¶ 68.)

#### a. Officer Brasca

Plaintiff alleges that, on one occasion, Officer Brasca took cigarettes from a 7-Eleven store that he frequented.[4] (*Id*. ¶ 69.) At the time of the incident, which occurred

---

[4] Officer Brasca ceased active duty with the Malverne Police Department in November, 1994, after sustaining a line of duty injury. (*Id*. ¶ 70.)

some time prior to September 1, 1994, Lieutenant Dwyer ("Lt. Dwyer") was Officer Brasca's supervisor. (*Id*. ¶¶ 71-72.) Following the incident, Officer Brasca was disciplined by Lt. Dwyer. (*Id*. ¶ 73.) This situation was not brought to the attention of Chief Raymond M. Garrigan ("Chief Garrigan"), the police chief at the time, until after Officer Brasca had already been disciplined by Lt. Dwyer. (*Id*. ¶ 74.) When Chief Garrigan learned of the incident, he was told by Lt. Dwyer that, at the time of the incident, Officer Brasca was on duty, that his police car was running in front of the 7-Eleven, that there was a long line at the register, that he took a single pack of cigarettes, and that Brasca intended to return to the store later and pay for the cigarettes. (*Id*. ¶¶ 75-76.) In fact, Brasca did return to the store and pay for the cigarettes. (*Id*. ¶ 77.)

The 7-Eleven store was located outside of the Village, and no one at the store called the police or filed any kind of complaint against Brasca regarding the cigarettes. (*Id*. ¶¶ 78-79.) Brasca was not arrested by the Nassau County Police Department, and the Nassau County Police Department did not file any criminal charges against him. (*Id*. ¶¶ 80-81.) The Mayor and the Board never learned of this incident and the incident was not the subject of any publicity. (*Id*. ¶¶ 82-83.)

Officer Brasca is also alleged to have used a police department account at a local car wash to wash his personal vehicle. (*Id*. ¶ 84.) At the time of this incident, Lt. Dwyer was Officer Brasca's supervisor. (*Id*. ¶ 85.) This incident occurred sometime prior to September 1, 1994. (*Id*. ¶ 86.) Officer Brasca was disciplined by Lt. Dwyer and this incident was not brought to then-Chief Garrigan's attention until after Brasca was already

disciplined. (*Id.* ¶¶ 87-88.) The car wash never called the police or filed any kind of complaint against Officer Brasca. (*Id.* ¶ 88.) Officer Brasca ultimately paid for the car wash and the Village was never charged for the car wash. (*Id.* ¶ 91.) The car wash was located outside of the Village. (*Id.* ¶ 92.) Officer Brasca was not arrested for this incident by the Nassau County Police Department and the Nassau County Police Department did not file any criminal charges against Officer Brasca. (*Id.* ¶ 94.) The Mayor and the Board never learned of the incident and the incident was not the subject of any publicity. (*Id.* ¶¶ 95-96.)

### b. Sgt. Damico

The third incident involved Sgt. Damico. (*Id.* ¶ 97.) Sgt. Damico was alleged to have voided a traffic summons in 1995 for an acquaintance of his. (*Id.* ¶¶ 98-99.) Following the incident, Sgt. Damico was disciplined by Lt. Frisenda. (*Id.* ¶ 100.) Sgt. Damico was asked to plead guilty and accept discipline or the Village would proceed with formal charges and specifications. (*Id.* ¶ 101.) According to defendant, Sgt. Damico accepted the discipline, which included the loss of vacation time and certain job responsibilities. (*Id.* ¶¶ 102-03.) The Mayor and the Board never learned of this incident and it was not the subject of publicity. (*Id.* ¶¶ 104-105.)

### 10. Village Police Department Disciplinary Procedures

Under Chief Garrigan, command level discipline was generally handled by supervisors rather than the Chief of Police. (*Id.* ¶ 106.) Chief Garrigan did not require that he personally approve of the command discipline administered by supervisors to police officers. (*Id.* ¶ 107.) Plaintiff testified that, earlier in his career, discipline was more lax in the Malverne Police Department than it later became. (*Id.* ¶ 108.) He characterized the supervision as the "old regime" versus the "new regime." (*Id.* ¶ 109.) According to plaintiff, the old regime was far less strict than the new regime in terms of disciplining police officers. (*Id.* ¶ 110.) Lt. Dwyer, who was the supervisor responsible for disciplining Officer Brasca, was one of the "old regime" supervisors whom plaintiff characterized as less strict. (*Id.* ¶¶ 111, 113.) Lt. Dwyer never disciplined plaintiff. (*Id.* ¶ 112.) According to plaintiff, the supervision of the Village Police Department became more strict after Lt. Dwyer retired on September 1, 1994. (*Id.* ¶ 114.)

The Mayor testified that he would have voted to terminate any police officer brought before the Board who was determined to have stolen anything. (*Id.* ¶ 131.) The only police officer brought before the Board for stealing during Mayor Panzarella's tenure was the plaintiff. (*Id.* ¶ 132.) The incidents involving Officer Brasca and Sgt. Damico occurred prior to Mayor Panzarella's tenure on the Board. (*Id.* ¶ 133.)

Glen Jacobsen ("Sgt. Jacobsen") was promoted to Sergeant in November 2004, after Lt. Dwyer's retirement. (*Id.* ¶¶ 115-116.) Sgt. Jacobsen became a supervisor in the same month that Officer Brasca ceased active duty.

7

(*Id.* ¶ 117.)   Plaintiff considered Sgt. Jacobsen, who was not a supervisor at the time of the two incidents involving Officer Brasca, to be part of the "new regime" of stricter supervisors. (*Id.* ¶¶ 118-119.) Sgt. Jacobsen was not involved in disciplining Officer Brasca, as Jacobsen was not a supervisor at the time. (*Id.* ¶ 121.) In 1998, Jacobsen was promoted to Lieutenant. (*Id.* ¶ 122.) Sgt. Jacobsen was a Sergeant at the time of Sgt. Damico's discipline concerning the allegation that he improperly voided a traffic summons, but Sgt. Jacobsen had no involvement in Sgt. Damico's discipline on that allegation. (*Id.* ¶¶ 123-125.)

Chief Garrigan alone made the decision to bring charges and specifications against plaintiff and no one assisted him in drafting the charges and specifications. (*Id.* ¶¶ 138-139.) Chief Garrigan did not discuss the allegations against plaintiff with any members of the Board prior to drafting the charges and specifications. (*Id.* ¶ 140.) Plaintiff does not allege that Chief Garrigan had any malice towards him. (*Id.* ¶ 141.) Instead, the only individual whom plaintiff alleges to have had malice towards him with respect to this matter was Sgt. Jacobsen. (*Id.* ¶ 142.) Plaintiff asserts only that Sgt. Jacobsen had malice towards him because of one incident in which plaintiff would not switch a vacation day with him on Father's Day, when they were both patrol officers in either 1993 or 1994, before Sgt. Jacobsen became a supervisor. (*Id.* ¶¶ 143-44.) Sgt. Jacobsen had no involvement in the decision to initiate charges against plaintiff and had no involvement in drafting the charges against plaintiff. (*Id.* ¶¶ 147-48.)

## B. Procedural History

Plaintiff filed the complaint in this action on October 10, 2003. On January 7, 2006, the Honorable Arthur D. Spatt issued a Memorandum and Order granting in part and denying in part defendants' prior motion for summary judgment. Specifically, Judge Spatt dismissed plaintiff's claim for attorneys' fees and noted that plaintiff had withdrawn his claim based on an alleged violation of his right against self-incrimination. The case was reassigned to this Court on March 31, 2006. Defendant again moved for summary judgment on October 19, 2006. Oral argument was held on the instant motion on February 15, 2007.

## II. Summary Judgment Standard

The standards for summary judgment are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, – F.3d – , 2007 WL 1880477, at *6 (2d Cir. July 2, 2007). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004);

8

*Anderson*, 477 U.S. at 248 (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir.1997)) (alteration in original). For the reasons that follow, the Court grants the instant motion in its entirety.

## III. DISCUSSION

Defendant argues that plaintiff's claims must fail on several grounds: (1) the Waiver Agreement bars plaintiff from suing the Village for claims arising out of the disciplinary hearings and plaintiff's resulting termination; (2) plaintiff had an adequate post-deprivation remedy to challenge his termination – namely, an Article 78 proceeding – and, in any event, plaintiff has failed to raise a genuine factual issue as to the merits of his due process claims; and (3) plaintiff has failed to present any evidence that he was treated differently than any similarly situated police officers so as to support his equal protection claim. For the reasons set forth below, the Court finds that plaintiff has waived his right to assert these claims and, in the alternative, has failed to raise a genuine factual issue as to the merits of any of his claims.

## A. The Waiver Agreement

First, defendant argues that plaintiff waived his right to assert the instant claims when he signed the Waiver Agreement in connection with his request for an adjournment of the disciplinary hearing. For the reasons set forth below, the Court agrees and finds that plaintiff waived "all possible claims and causes of action" arising from the Village's resolution of the disciplinary charges against plaintiff when he signed the Waiver Agreement. (Dft.'s Ex. K.)

To determine whether plaintiff waived his right to assert constitutional claims under Section 1983, this Court does not rely on New York law, since "'the question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law.'" *Legal Aid Soc. v. City of New York*, 114 F. Supp. 2d 204, 226 (S.D.N.Y. 2000) (quoting *Brookhart v. Janis*, 384 U.S. 1, 4 (1966)); *Kreuter v. Reuter*, No. 01 Civ. 5229 (NGG), 2002 WL 31946715, at *5 (E.D.N.Y. Dec. 5, 2002). The Supreme Court has consistently held that constitutional rights may be waived upon clear and convincing evidence that the waiver is knowing, voluntary and intelligent. *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185 (1972) (holding that a debtor's waiver of his individual due process rights was effective); *see, e.g., Town of Newton v. Rumery*, 480 U.S. 386, 397-98 (1987) (finding waiver of right to sue government); *Faretta v. California*, 422 U.S. 806, 835 (1975) (right to counsel); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 145 (1967) (first amendment rights); *see also Doe v. Marsh*, 105 F.3d 106, 111 (2d Cir. 1997) (noting that Supreme Court and Second Circuit jurisprudence "suggests that the waiver of a fundamental right in the context of civil cases must be made voluntarily, knowingly and intelligently") (citing *United States v. Local 1804-1*, 44 F.3d 1091, 1098 n.4 (2d Cir. 1995)). Furthermore, waivers of fundamental rights, such as those asserted by plaintiff in the instant case, cannot be presumed or lightly inferred, and courts "must

indulge every reasonable presumption against waiver."[5]  *Legal Aid Soc.*, 114 F. Supp. 2d at 226-27; *see also Fuentes v. Shevin*, 407 U.S. 67, 95 n.31 (1972) ("[I]n the civil no less than the criminal area, 'courts indulge every reasonable presumption against waiver.'") (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937)); *Williams v. Codd*, 459 F. Supp. 804, 816 (S.D.N.Y. 1978) ("In determining whether this settlement precludes the instant action, it must be remembered that the waiver of constitutional rights will not be lightly implied.").

In the instant case, plaintiff's waiver of claims was done voluntarily, knowingly, and intelligently.  That is, the record clearly indicates that the Waiver Agreement constituted a release of plaintiff's right to assert due process and equal protection claims under Section 1983 arising from the disciplinary hearings, or challenging the disciplinary measures imposed on plaintiff as a result thereof.  It is undisputed that plaintiff signed the agreement upon the advice of counsel, was aware that he was waiving any claims he had against the Village arising from the disciplinary hearings, and signed the agreement with the specific aim of obtaining an adjournment of the First Hearing.  Furthermore, the plain language of the Agreement makes clear its significance with regard to plaintiff's ability to bring suit in a judicial forum for claims relating to the disciplinary hearings or the result thereof.  As noted *supra*, the Waiver Agreement specifically bars plaintiff from asserting "any constitutional or other defenses to the Village's hearing or finally determining such [disciplinary] charges, including but not limited to claims of denial of procedural or substantive due process based upon knowledge of the Village's Board of Trustees regarding the circumstances or merits of such charges."  (Dft.'s Ex. K.)  Moreover, the Waiver agreement contains a more general release clause, stating that "[plaintiff] freely relinquishes, releases, and waives all possible claims and causes of action against the Village, its successors, assigns, agents, employees, Board of Trustees, and attorneys in their official and individual capacities alleging that his suspension without pay was improper or that his due process rights were violated in any manner."  (*Id.*)

---

[5] These standards also apply to contractual waivers of constitutional rights.  For example, in the criminal context, the Second Circuit has suggested that certain fundamental rights may be waived through a signed document as long as the document contains "language expressly stating that [the defendant] would be barred from asserting this [right] in future criminal proceedings." *United States v. Morgan*, 51 F.3d 1105, 1110 (2d Cir. 1995).  In addition, in the civil context, "a party waiving constitutionally protected rights – even when doing so through the execution of a contract – must also be made aware of the significance of the waiver." *Morris v. N.Y.C. Employees' Retirement Sys.*, 129 F. Supp. 2d 599, 609 (S.D.N.Y. 2001).  Similarly, courts consistently enforce so-called "release-dismissal" agreements, wherein a criminal defendant agrees to waive her right to sue the government under Section 1983 in exchange for a favorable disposition of criminal charges against the defendant – at least where the defendant enters into such an agreement knowingly and voluntarily. *See, e.g., Rumery*, 480 U.S. at 396-97; *Mozzoch v. Borden*, 959 F.2d 1174, 1181 (2d Cir. 1992) ("Where a criminal prosecution remains supported by probable cause, the Constitution does not necessarily prohibit the prosecutor from seeking a release-dismissal agreement with the criminal defendant."); *Elk v. Townson*, 839 F. Supp. 1047, 1053-54 (S.D.N.Y. 1993).

In addition, the Agreement states that plaintiff "had a full and fair opportunity to consult with his chosen attorney and union representative before signing the Agreement, . . . that he has read it carefully and fully understands its contents . . . and certifies that the signing of this Agreement is voluntary and has not been forced or coerced in any way." (*Id.*) Plaintiff has failed to present any evidence that contradicts the accuracy of this statement in any way or creates a material issue of fact as to the circumstances surrounding his waiver as described in the Agreement. Therefore, the Court finds that plaintiff's waiver of his right to assert the constitutional claims was knowing, voluntary, and intelligent.

Plaintiff argues that the Agreement should not be enforced because plaintiff signed it under duress. (Pl.'s Opp. at 3.) However, plaintiff does not argue that the Agreement was the product of some undue coercion or misconduct on the part of the Village. Instead, plaintiff contends that he was subject to duress because he signed the Agreement due to his desire to avoid the risk that his testimony at a disciplinary hearing would be used against him in a subsequent criminal trial. Therefore, according to plaintiff, he signed the Agreement solely in order to obtain an adjournment of the disciplinary hearing pending the resolution of the criminal case against him.

The Court rejects plaintiff's argument that the Agreement should be void on the ground of duress. As discussed *supra*, the undisputed evidence demonstrates that plaintiff knowingly and voluntarily waived his right to sue the Village, and plaintiff has failed to present any evidence to the contrary. In asserting that the Agreement was the product of duress, plaintiff merely states the reason

that he signed the Agreement – namely, to avoid testifying at the disciplinary hearing prior to resolution of the criminal charges against plaintiff – and asserts that the mere existence of that reason constitutes duress. However, the fact that plaintiff had some reason to sign the Agreement does not, by itself, demonstrate that he was forced to do so or was subject to undue pressure. That is, assuming *arguendo* that plaintiff feared that his testimony at the disciplinary hearing would be used against him in a later criminal trial, plaintiff had the option to decline to sign the Agreement, and then to appear at the hearing and invoke his Fifth Amendment privilege against self-incrimination in order to avoid the risk that such testimony would be used against him in a criminal trial. As such, it is clear that plaintiff had the option to decline to sign the agreement while also avoiding the risk that he would incriminate himself. Therefore, plaintiff's argument fails to raise a genuine issue as to whether plaintiff waived his rights of his own volition, and with a full understanding of the consequences of the waiver.[6]

---

[6] Plaintiff's argument could be construed as a request for a *per se* rule regarding release-adjournment agreements. That is, plaintiff's "duress" argument essentially asks this Court to apply a rule that would void *any* agreement whereby an individual waives constitutional claims against the government in exchange for adjourning of a pre-termination hearing, at least where the individual actually desires to adjourn the hearing. With regard to "release-dismissal" agreements in criminal cases, the Supreme Court has refused to apply such a *per se* rule:

It is true, of course, that § 1983 actions to vindicate civil rights may further significant public interests. But it is important to remember that [the plaintiff] had no public duty to institute a § 1983

Accordingly, plaintiff's claims under Section 1983 for violations of his constitutional rights are barred based upon the Waiver Agreement.

## B.  Section 1983 Claims

However, even assuming *arguendo* that the Waiver Agreement did not bar plaintiff's claims, the Court finds that plaintiff has failed to raise a genuine issue of material fact as to any of his claims. Accordingly, for the reasons set forth below, the Court finds that plaintiff's claims under Section 1983 must fail as a matter of law.

## 1. Due Process

Plaintiff asserts that defendant violated his procedural and substantive due process rights during the Second Hearing and by terminating plaintiff's employment. However, plaintiff's due process claims must fail because (1) he was afforded all the procedure due to him, and (2) he has failed to present any evidence that he was denied a right guaranteed to him by the Due Process Clause.

---

action merely to further the public's interest in revealing police misconduct. Congress has confined the decision to bring such actions to the injured individuals, not to the public at large. Thus, we hesitate to elevate more diffused public interests above [the plaintiff's] considered decision that he would benefit personally from the agreement.

*Rumery*, 480 U.S. at 395.

## a. Procedural Due Process

"[A] due process claim for the deprivation of a property interest is not cognizable in a federal district court if state courts provide a remedy for the deprivation of that property interest." *Gabris v. N.Y.C. Taxi and Limousine Comm'n*, No. 05 Civ. 8083 (HB), 2005 WL 2560384, at *3 (S.D.N.Y. Oct. 12, 2005); *see Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 543-44 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *Marino v. Ameruso*, 837 F.2d 45, 47 (2d Cir. 1988); *see also Vialez v. N.Y.C. Hous. Auth.*, 783 F. Supp. 109, 113-14 (S.D.N.Y.1991) ("[W]here a plaintiff alleges deprivation of property in violation of the due process clause, the federal court's initial inquiry must be whether the state has provided adequate remedies to redress such unlawful acts. If so, there will be no claim before the federal court, whether or not the plaintiff took advantage of the state procedure."). It is well-settled that the state-court remedy of an Article 78 proceeding "constitutes a wholly adequate post-deprivation hearing for due process purposes." *Locurto v. Safir*, 264 F. 3d 154, 173 (2d Cir. 2001); *accord Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 157 (2d Cir. 2006).

Here, it is undisputed that plaintiff had the opportunity to seek relief through an Article 78 proceeding in New York State court for the deprivation of any interest suffered by plaintiff during the Second Hearing. Nevertheless, plaintiff argues that "it would have served no purpose for [him] to commence another Article 78 proceeding" following the Second Hearing because such a proceeding did not constitute "an adequate post-deprivation remedy." (Pl.'s Opp. at 4.) Specifically, according to plaintiff, he

believed an Article 78 proceeding was not adequate to protect his rights because, after the Appellate Division directed the Village to conduct a *de novo* re-hearing of the disciplinary charges against plaintiff, the Village admitted the entire record of the First Hearing into evidence in the Second Hearing. Thus, according to plaintiff, the Village's failure to abide by the decision reached in the first Article 78 proceeding rendered inadequate the remedies that could be obtained in any future Article 78 proceeding.

The Court rejects plaintiff's argument. Even assuming *arguendo* that plaintiff suffered some deprivation of a protected property interest during the Second Hearing, it is clear that plaintiff had the opportunity to attempt to remedy that injury by initiating an Article 78 proceeding in New York State court, just as he had done after the First Hearing. In fact, in the Article 78 proceeding initiated by plaintiff after the First Hearing, plaintiff obtained a favorable judgment from the court based on certain procedural errors by the Village following the First Hearing.[7] Plaintiff has failed to point to any reasonable justification for his belief that a second Article 78 proceeding would provide an inadequate post-deprivation remedy, or to offer *any* evidence from which that conclusion could reasonably be inferred. In any event, the fact that plaintiff subjectively believed it would be futile to initiate a second Article 78 proceeding does not alter the fact that the state-court remedy of an Article 78 proceeding constituted a wholly adequate post-deprivation hearing for any injury

suffered by plaintiff. Accordingly, because New York State courts provide an adequate remedy for any deprivation of a property interest suffered by plaintiff at the Second Hearing, plaintiff's due process claim for the deprivation of such an interest is not cognizable in this Court.

In any event, even assuming *arguendo* that plaintiff could assert a challenge to the procedures employed during the Second Hearing, the Court finds that there is no genuine issue as to whether plaintiff was denied due process. "[A] pre-termination hearing does not purport to resolve the propriety of the discharge, but serves mainly as a check against a mistake being made by ensuring there are reasonable grounds to find the charges against an employee are true and would support his termination. Requiring more than notice of the charges, an explanation of the nature of the employer's evidence, and an opportunity for the employee to respond would impede the government's interest in quickly removing from service an unsatisfactory employee." *Locurto v. Safir*, 264 F.3d at 173-74 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-46 (1985)) (internal citation omitted).

Here, the undisputed facts found in the record clearly demonstrate that plaintiff received notice of the disciplinary charges against him, an explanation of the nature of the Village's evidence, and an opportunity to respond. (*See* Dft.'s Exs. Q-R.) Furthermore, during his testimony at the Second Hearing, plaintiff admitted that he had, in fact, stolen the items from Home Depot, as alleged in the disciplinary charges, and, thus, vitiated the main purpose of a pre-termination hearing – namely, to ensure that there are reasonable grounds to find the charges against an employee are true and would support his

---

[7] Specifically, the New York Supreme Court found that the Village had erred in denying plaintiff's timely request for a rehearing following plaintiff's conviction at the First Hearing. (*See* Dft.'s Ex. Q-R.)

termination. (Dft.'s Ex. M. at 55.)

In addition, to the extent that plaintiff argues that the Village denied plaintiff due process by incorporating the transcript of the First Hearing into the record at the Second Hearing, and, thus, denied plaintiff his right to a *de novo* hearing, the Court rejects that argument. Plaintiff does not, and cannot, point to any applicable rule or law barring the admission of a transcript of a prior pre-termination hearing at a second hearing. As the Board indicated at the Second Hearing, notwithstanding the admission of the transcript of the First Hearing, the Village still had to meet its burden in order to convict plaintiff of the disciplinary charges, and plaintiff's counsel had the opportunity to re-call any witness from the First Hearing whom plaintiff wished to subject to further cross-examination. (*See* Dft.'s Ex. M, at 19.) Furthermore, at the Second Hearing, plaintiff once again had the opportunity to testify and to respond to the Village's evidence. As such, there is no genuine issue as to whether plaintiff received an adequate pre-termination hearing that served as "a check against a mistake being made by ensuring there are reasonable grounds to find the charges against an employee are true and would support his termination." *Locurto*, 264 F.3d at 173-74 (internal citation omitted).

b. Disciplinary Charges

Plaintiff argues that, because the specific disciplinary charges brought against him are "not contained in the . . . Village of Malverne Police Department Rules and Regulations," the charges are "tantamount to a bill of attainder" in violation of plaintiff's right to due process. (Pl.'s Mem. at 5.) It is not clear whether plaintiff asserts that this conduct violated plaintiff's "substantive" or "procedural" due process rights. In any event, the Court finds that the claim must fail because plaintiff has not presented any evidence that the disciplinary charges constituted an impermissible bill of attainder or that plaintiff's due process rights were violated.

The Constitution prohibits states from issuing bills of attainder. *See* U.S. Const. art. I, § 10. "[A] constitutionally proscribed bill of attainder is 'a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial.'" *Consol. Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 346 (2d Cir. 2002) (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977)). Thus, "a statute can be a bill of attainder only if (1) it 'determines guilt and inflicts punishment,' (2) 'upon an identifiable individual,' and (3) 'without provision of the protections of a judicial trial.'" *Pataki*, 292 F.3d at 346 (quoting *Nixon*, 433 U.S. at 468). Furthermore, because "the 'historical function' of the [bills of attainder] Clause has been to ensure the procedural protections of the judicial process," due process rights are often intertwined with the prohibition on bills of attainder. *Id.* at 347.

Here, the record clearly demonstrates that the disciplinary charges brought against plaintiff were, indeed, administrative *charges*, and not a legislative determination of guilt that denied plaintiff the protections of a judicial trial. The Village's charging document expressly states that "[y]ou are hereby charged with the following," and provides a date and time for a hearing of the charges levied against plaintiff. (Dft.'s Ex. J.) Furthermore, it is undisputed that plaintiff took part in two disciplinary hearings wherein the disciplinary charges were adjudicated, and

in which, as discussed *supra*, plaintiff, with the assistance of counsel, was afforded the opportunity to contest the charges and the evidence offered against him.

Furthermore, to the extent that plaintiff argues that he was not put on notice that his conduct may be in violation of the Village's rules, and that such a lack of notice violated plaintiff's due process rights, the Court rejects that argument. Assuming *arguendo* that plaintiff had a right to receive notice that his conduct may be subject to discipline, the undisputed facts demonstrate that there is no genuine issue as to whether plaintiff received sufficient notice that, in response to the type of conduct plaintiff engaged in – namely, shoplifting – the Village would seek to bring disciplinary charges against plaintiff. Specifically, sections IV(1), IV(6), IV(27), and VI(1) of the Rules and Regulations provide, respectively:

It is the duty of the department and the members of the department, at all times of the day and night, to protect life and property, prevent crime, detect and arrest offenders, preserve the public peace, and enforce the laws and ordinances over which the department has jurisdiction.

It shall be their duty especially to see that all provisions of the law regulating [sic] to crime or offenses against person or property, against the public health and safety, against the public peace, as well as all rules, regulations, orders, by-laws, and ordinances of the Village are enforced.

A member of the department shall report to the Chief of Police delinquency, dereliction of duty,

violation of the rules and regulations, conduct, disorder and neglect to the prejudice of good order, efficiency and discipline, which he observes or of which he has knowledge on the part of any other member of the department.

Charges, in writing, shall be preferred against any member of the department alleged to be guilty of neglect or dereliction in the performance of official duty or violation of these rules and regulations or of police orders or of any other police regulations, or disobedience or incompetency to perform official duty or an act of delinquency seriously affecting his general character or fitness for office.

(*Id.* ¶¶ 21-24.) It is beyond doubt that the above-cited provisions give unambiguous notice to Village Police Officers that any conduct by an officer in violation of the officer's duty to "protect . . . property [and] prevent crime," to enforce laws relating to crimes against property, and to otherwise avoid "delinquency seriously affecting his general character or fitness for office," will result in disciplinary charges being brought by the Village against the officer. (*Id.*) Therefore, although the provisions do not specifically proscribe shoplifting, the scope of the provision's prohibitions clearly encompass such a crime, and, accordingly, provide sufficient notice that the Village would bring disciplinary charges against any officer, such as plaintiff, who engaged in shoplifting.

c. The Release of Confidential Information

Plaintiff also alleges that Mayor Panzarella released to the public confidential information obtained from sealed records

15

relating to the criminal case against plaintiff, and that Mayor Panzarella's "leaking" violated plaintiff's due process rights. The Court rejects this claim because plaintiff has failed to proffer any evidence to raise a genuine issue as to the validity of plaintiff's assertion regarding Mayor Panzarella, or as to whether it violated a right held by plaintiff.

Plaintiff asserts that, following his guilty plea in New York State court, the court directed that the record of his criminal case be sealed. (*See* Dft.'s Ex. L. at 41-42.) Thereafter, according to plaintiff, Mayor Panzarella "had access to plaintiff's sealed court records," and leaked certain confidential information to the public. (Compl. ¶ 61; Pl.'s Mem. at 5-6.) In support, plaintiff identifies a single instance of alleged "leakage," wherein Mayor Panzarella was quoted in the *Malverne Community Times*, in an issue published on October 7, 1999 – following plaintiff's guilty plea and preceding the First Hearing – stating:

> Now that it has been adjudicated in the court of law, the Village Board will hold an administrative hearing. . . .  We will have to consider the facts presented to us and make a determination what kind of action, if any, to be taken against [plaintiff]. We can, but we do not have to take into account the criminal proceeding.

(Dft.'s 56.1 ¶ 63; Dft.'s Ex. W.)

Drawing all reasonable inferences in plaintiff's favor, the Court finds that Mayor Panzarella's statement does not provide any basis from which a reasonable jury could conclude that Mayor Panzarella had access to confidential information regarding the criminal case against plaintiff, or had leaked

such information to the public.[8] The article did not state that Mayor Panzarella had access to plaintiff's criminal court file, nor did it provide any basis to infer that Mayor Panzarella had such access. Indeed, at the First Hearing, Mayor Panzarella indicated that he had not seen the records from the criminal case against plaintiff until the day of the First Hearing, at which time the records were presented to the hearing board pursuant to an unsealing order obtained by plaintiff.[9] (*See* Dft.'s Ex. L. at 45.) Furthermore, although Mayor Panzarella's statement refers to resolution of the criminal case against plaintiff, it is undisputed that the fact of plaintiff's guilty plea was public knowledge at

---

[8] Plaintiff also asserts that the above-quoted statement by Mayor Panzarella required him to recuse himself from participating in the disciplinary proceedings in order "to avoid the appearance of impropriety." (Pl.'s Mem. at 6.) The Court rejects this claim because the Second Circuit has specifically found that "a non-neutral adjudicator may yet comport with due process" where, as here, "the state affords plaintiff, subsequent to his termination, a full adversarial hearing before a neutral adjudicator," such as an Article 78 proceeding in New York State court. *Locurto v. Giuliani*, 447 F.3d 159, 171 n.4 (2d Cir. 2006) (internal quotation marks and citation omitted). As such, even assuming *arguendo* that Mayor Panzarella was somehow biased against plaintiff – a contention wholly unsupported by the record, including the above-cited statement by the Mayor that the disciplinary board would "consider the facts presented to us" – plaintiff has failed to state a claim that Mayor Panzarella's service on the Board during the disciplinary hearings violated plaintiff's right to due process. (Dft.'s Ex. W.)

[9] The Court notes that, during the First Hearing, plaintiff's then-counsel stated that he was "satisfied . . . that nobody saw these documents [relating to the criminal case against plaintiff] until tonight or for that matter, they might not have looked at them as of yet." (Dft.'s Ex. L at 50.)

the time of the Mayor's statement: plaintiff's allocution occurred in "open court" and members of the press were, in fact, present in the courtroom during the plea. (Dft.'s Ex. BB, at 238-40.) Accordingly, the Court finds that there is no genuine issue of material fact as to whether Mayor Panzarella had access to sealed court records relating to the criminal case against plaintiff, and released confidential information to the public.[10]

### 2. Equal Protection Claim

Plaintiff alleges that the Village "selectively treated" him by punishing him more severely than other similarly situated police officers and, thus, violated plaintiff's right to equal protection. (*See* Pl.'s Mem. at 6-8.) For the reasons that follow, the Court finds that there is no evidence from which a reasonable jury could conclude that plaintiff's right to equal protection was violated and, thus, summary judgment on this claim is warranted.

### a. *Monell*

As an initial matter, because plaintiff seeks relief against the Village, he must satisfy the requirements of a *Monell* claim. That is, plaintiff must show, *inter alia*, that the alleged "constitutional deprivation was caused by an actor with final policymaking authority, the question of which municipal officials are the final policymakers is one of law, and the question is resolved by looking to relevant state law." *Skehan v. Village of*

*Mamaroneck*, 465 F.3d 96, 109 (2d Cir. 2006) (citing *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000)). In *Skehan*, the Second Circuit affirmed the grant of summary judgment dismissing the equal protection claims of police officers formerly employed by the Village of Mamaroneck. The court initially noted that it was undisputed that the Board of Trustees of the Village of Mamaroneck was the "final policymaker in the area of police supervision and discipline." *Skehan*, 465 F.3d 96, 112. However, the court found that the former officers – who alleged they were "disciplined more harshly than other police officers who committed similar violations of departmental rules" – failed to offer sufficient evidence that the Board of Trustees itself, rather than police supervisors without final policymaking authority, had violated the officers' rights. Accordingly, the court found the dismissal of the plaintiffs' equal protection claims to be proper. *Id.* at 112.

Here, plaintiff argues that the Board knew of, and implicitly consented to, the actions of police supervisors with regard to the discipline of other, similarly situated officers. However, plaintiff offers absolutely no evidence to support that argument. In fact, defendant offers no evidence that would create a genuine issue as to the accuracy of Mayor Panzarella's testimony that, on a "day-to-day" basis, "disciplinary stuff in the [Village police] department was handled by the chief of police." (Dft.'s Ex. EE at 31.) In short, based upon the record in this case, there is no evidence from which a reasonable jury could conclude that the Board "consciously applied a different standard" for evaluating other officers' conduct when it permitted some officers to be disciplined by police supervisors rather than the Board itself. *Cf. Skehan*, 465 F.3d at 112 ("[I]f the Board itself never dealt with the previous officers'

---

[10] Even assuming *arguendo* that Mayor Panzarella had leaked certain non-public information relating to plaintiff, plaintiff has failed to cite any case in support of the proposition that such conduct alone would violate plaintiff's rights, and, thus, support a claim under Section 1983.

17

conduct, it could not treat the plaintiffs here disparately."). Therefore, there is no evidence from which a reasonable jury could find that the requirements of *Monell* are satisfied.

### b. "Malice" Equal Protection Claim

In any event, plaintiff's equal protection claim must fail as a matter of law because plaintiff has failed to establish a genuine issue of material fact as to whether other, similarly situated officers were treated differently by the Village.  Plaintiff alleges that the Village intentionally treated him differently from other similarly situated police officers because of a malicious intent on the part of the Village to harm plaintiff.  With regard to this type of "malicious intent" equal protection claim, the Second Circuit has observed that:

> [C]ases predicating constitutional violations on selective treatment motivated by ill-will, rather than by protected-class status or an intent to inhibit the exercise of constitutional rights, are "lodged in a murky corner of equal protection law in which there are surprisingly few cases and no clearly delineated rules to apply."

*Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)).  Nevertheless, it is well-settled that such claims only "provide[] protection from adverse governmental action that is not motivated by 'legitimate governmental objectives.'  If the motivation to punish is to secure compliance with agency objectives, then by definition the motivation is not spite, or malice, or a desire to 'get [someone] for reasons wholly unrelated to any legitimate state objective.'"  *Bizzarro*, 394 F.3d at 87 (quoting *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995) (Posner, J.)).

Furthermore, plaintiff cannot "merely rest on a showing of disparate treatment"; he must show that the disparate treatment "was *caused by* the impermissible motivation."  *Bizzarro*, 394 F.3d at 87 (emphasis in original).

### i. Similarly Situated Police Officers

Here, the Court finds that there is no genuine issue of fact as to whether plaintiff has identified similarly situated officers who were treated differently than plaintiff.  Plaintiff asserts that two other individuals formerly employed as Village police officers, Sgt. Damico and Officer Brasca, engaged in conduct similar to plaintiff but received less severe forms of discipline from the Village.  However, for the reasons set forth below, the Court finds that plaintiff has failed to establish the requisite "level of similarity" between himself and the other two former officers so as to support his equal protection claim.

"To prevail on a selective treatment claim, a plaintiff must show that (1) he was treated differently from other similarly-situated individuals; and (2) the differential treatment was based on 'impermissible considerations such as . . . malicious or bad faith intent to injure a person.'"  *Skehan*, 465 F.3d at 110 (quoting *Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)) (additional internal quotation marks and citation omitted).  As to the similarly-situated element, the Second Circuit has found that:

> "[T]he level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high."  *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005).  A plaintiff must show that (1) "no rational person could regard the circumstances of the plaintiff to differ

from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and [(2)] the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.* at 105.

*Skehan*, 465 F.3d at 110. "A court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation, [] where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citing *Harlen Assocs.*, 273 F.3d at 499 n.2).

Plaintiff fails to satisfy this standard in the instant case, as no reasonable jury could find that the police officers to whom plaintiff compares himself are similarly situated. There are numerous, significant differences between plaintiff's conduct and that of the two other officers. First, criminal complaints were not filed against Officer Brasca or Sgt. Damico. Second, neither individual was arrested by the NCPD, brought up on criminal charges by the Nassau County District Attorney's Office (the "DA"), or convicted of any crime. Third, neither individual was barred from entering onto the premises of the property where they allegedly engaged in illegal conduct, and, thus, were not impeded in their ability to respond to calls at such locations. Furthermore, the other officers' respective improper conduct was not the subject of any significant media activity, and, thus, did not call into question the credibility of the individual officers or the public-standing of the Village Police Department.

By contrast, it is undisputed that plaintiff shoplifted several items from Home Depot; that the store's managers filed a criminal complaint against plaintiff; that plaintiff signed an agreement with Home Depot in which he agreed that his presence in any Home Depot store would constitute a trespass under New York Penal Law; that plaintiff was arrested by the NCPD; that, following a grand jury probe, plaintiff was charged with petit larceny by the DA; that plaintiff pled guilty to the crime of disorderly conduct; and that plaintiff's case was the subject of substantial coverage by the local print media.

These differing circumstances sufficiently distinguish plaintiff's conduct from that of the other two officers such that no reasonable jury could conclude that the "level of similarity" between the parties is "extremely high." *Neilson*, 409 F.3d at 104. In other words, there is no genuine issue as to whether plaintiff could establish that "no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy." *Id.* at 105. Instead, the undisputed facts demonstrate that the only conclusion that could be drawn by a rational person is that the differing circumstances cited above justified the differential treatment of the parties on the basis of the legitimate government policy of measured discipline. In other words, the differing circumstances found in the record unambiguously support the Village's position that it punished plaintiff relatively more severely because his conduct constituted a relatively more egregious breach of the Village's Rules and Regulations regarding the conduct of police officers.[11]

_____

[11] Defendant argues that another officer who was similarly situated to plaintiff did, in fact, receive

19

Accordingly, because there is no genuine issue as to whether plaintiff could satisfy the similarly situated element of his claim, the Court need not reach the second prong of the *Neilson* standard and the equal protection claim is dismissed.

### ii. Malice

Furthermore, even assuming *arguendo* that plaintiff had demonstrated that other similarly, situated officers were treated differently than plaintiff, the Court finds that there is no genuine issue as to whether plaintiff's disparate treatment was the product of the Village's malice toward plaintiff, rather than the product of the Village's desire to achieve the "legitimate governmental objective" of enforcing its rules and regulations regarding the conduct of police officers. *Bizzarro*, 394 F.3d at 87. Plaintiff has failed to present *any* evidence from which a reasonable jury could find that the Village's

---

the same punishment as plaintiff. Specifically, defendant points to the termination of former Village Police Lieutenant Schiller ("Lt. Schiller"). According to defendant, at some point in 1999, the Village brought disciplinary charges against Lt. Schiller, alleging that he stole money from the Village's parking meters. (Dft.'s 56.1 ¶ 128.) Subsequently, following a public disciplinary hearing before the Board, Lt. Schiller was fired by the Village. (*Id.* ¶ 130; Dft.'s Ex. EE, at 38.) However, defendant has failed to present evidence demonstrating that Lt. Schiller was similarly situated to plaintiff; that is, defendant has not presented evidence establishing that a criminal complaint was made against Lt. Schiller, that he was charged with, or pled guilty to, a crime, or that his case was the subject of intense media attention. Accordingly, the Court has not relied on the evidence regarding Lt. Schiller in granting summary judgment as against plaintiff's equal protection claim.

actions were motivated by malice.

Plaintiff asserts that a single individual employed by the Village, Sgt. Jacobsen, harbored malice toward plaintiff.[12] (Pl.'s Mem. at 8-9.) However, even assuming *arguendo* that Sgt. Jacobsen had such malice toward plaintiff, there is no evidence in the record demonstrating that Sgt. Jacobsen was involved in the disciplinary actions taken against plaintiff, or against the other officers that were allegedly similarly situated to plaintiff. As to the discipline against plaintiff, there is no evidence showing that Sgt. Jacobsen was involved in the decision to bring disciplinary charges against plaintiff, in drafting the charges, or in adjudicating the charges.[13] Similarly, there is no evidence showing that Sgt. Jacobsen was involved in disciplining the other, purportedly similarly situated officers identified by plaintiff.[14]

---

[12] Plaintiff argues that he had an argument with then-Lieutenant Jacobsen in either 1993 or 1994 over switching vacation days, and that, as a result, Sgt. Jacobsen "had malice towards" plaintiff. (*See* Dft.'s Ex. BB at 53-55; Pl.'s Mem. at 8.)

[13] The sole evidence of causation offered by plaintiff is his assertion that Sgt. Jacobsen participated in the investigation of the shoplifting incident involving plaintiff. (*See* Pl.'s Mem. at 8.) However, plaintiff does not assert that there was any misconduct or other impropriety on the part of Sgt. Jacobsen or the Village police department during that investigation that caused plaintiff to be treated disparately by the Village. Instead, plaintiff argues that the disciplinary hearing conducted *by the Board* – rather than the police investigation – resulted in the "selective treatment" of plaintiff. (*See id.* at 7-8.)

[14] Furthermore, the Court notes that, at the time Officer Brasca was disciplined, Sgt. Jacobsen was not a supervisor, and, thus, not in a position to discipline officers. At the time Sgt. Damico was disciplined, Sgt. Jacobsen had obtained the

Accordingly, because plaintiff has failed to proffer any evidence regarding Sgt. Jacobsen's involvement in the disciplinary actions taken against plaintiff, and, thus, cannot, as a matter of law, demonstrate that the Board's decision to discipline plaintiff was "caused by" Sgt. Jacobsen's ill-will toward plaintiff, the Court finds that there is no genuine issue as to whether "the motivation to punish" plaintiff was anything other than the Village's desire "to secure compliance with agency objectives." *Bizzarro*, 394 F.3d at 87 (internal citation omitted).

### IV.  CONCLUSION

For the reasons stated above, the motion for summary judgment is granted in its entirety. Plaintiff's claims are dismissed. The Clerk of the Court shall close this case and enter judgment accordingly.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 8, 2007
Central Islip, New York

* * *

The attorney for plaintiff is James L. Iannone, Esq., Gordon, Sibell & Iannone, P.C., 400 Garden City Plaza, Suite 106, Garden City, New York 11530.  The Attorney for defendant is Steven C. Stern, Esq., Miranda & Sokoloff, LLP, 240 Mineola Boulevard, The Esposito Building, Mineola, New York 11501.

---

position of Sergeant but, as noted *supra*, there is no indication that he was involved in the decision to discipline Sgt. Damico.

21